GERTRUDE E. BIRCH *vs.* ARNOLD AND SEARS, INCORPO-
RATED, & others.

Suffolk. February 9, September 10, 1934. — October 23, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, & DONAHUE, JJ.

*Stockbroker. Fiduciary. Equity Jurisdiction*, Accounting. *Sale*, Of
securities, Rescission. *Evidence*, Presumptions and burden of proof.
*Equity Pleading and Practice*, Master: findings of fact, recommittal,
objections to report; Stipulation; Appeal. *Notice.*

A stockbroker stood in a fiduciary relationship to a woman with respect
to the investment of her money by him over a period of about three
years. During that period, he, without disclosure to her, realized
profits by selling securities to her and purchasing securities from her
as a dealer, instead of purchasing them from and selling them to
others as a broker. At the end of the three years, she took the man-
agement of her investments out of his hands, and thereafter, during a
period of about two years, sold most of the securities which he had
sold to her and had not repurchased from her. At the end of the two
years, she discovered for the first time the nature of his conduct in
handling her investments. She thereupon tendered to him the se-
curities which she still had and securities identical with those which
she had sold during the two years, together with all interest, dividends
and benefits received by her on the securities from the dates on which
they were sold to her up to and including the date of the tender; and
demanded of him the price which she had paid for the securities with
interest. In a suit in equity by her against him, it was *held*, that, in
the circumstances, the plaintiff was entitled to rescind the sale of the
securities to her by the defendant, notwithstanding that she had
sold some of the securities before seeking to rescind.

The suit above described was referred to a master. No evidence was
presented to him at any time showing that the plaintiff realized
profits from the sale by her of some of the securities in question.
The defendant, in consenting to a decree recommitting the suit to
the master, raised no question as to such profits. After the filing of
the master's supplemental report, the parties stipulated that "the
total of all the interest dividends and benefits which were or should
have been received by the plaintiff upon these securities from any
source from the respective dates of their acquisition up to and includ-
ing" the time of the plaintiff's tender, was a certain sum. The mas-
ter's reports were confirmed, and a final decree was entered directing
the defendant to pay to the plaintiff the total sum for which the secu-
rities were sold by the defendant to the plaintiff less their market
value on the date of the plaintiff's tender and the sum so stipulated as

the amount of interest, dividends and benefits received by the plaintiff, and also to pay the plaintiff the total of the secret profits realized by the defendant, and interest. Upon appeal by the defendant, it was *held*, that

(1) The burden was on the defendant, not the plaintiff, to prove the price for which the plaintiff sold some of the securities previous to her tender and that she had realized a profit from such sales for which she had not accounted;

(2) On the record, there was no error in overruling certain exceptions by the defendant to the master's reports based on his failure to make findings as to "the interest, dividends and money received directly by the plaintiff by reason of her ownership of the securities" and as to "what money the plaintiff received from the sale of" the securities;

(3) The stipulation was to be considered with the findings in determining the question, whether, on all the facts, the final decree was proper;

(4) The final decree was proper and must be affirmed.

On findings by a master in a suit in equity, that a woman gave all her money to a stockbroker to invest in her behalf; that she, to his knowledge, was without business experience and was entirely ignorant concerning the making of investments; that he told her that he would invest her money for her, would advise her concerning her investments, and would take care of her well; that he invited her to have absolute confidence in him; that thereafter she relied wholly on him and exercised no independent judgment whatever; and that he knew that she had great confidence in him and trusted him, the proper conclusion was that the relationship between him and her was not that which ordinarily exists between a stockbroker and his customer, but was of a fiduciary nature.

Upon further findings by the master above mentioned that the stockbroker realized profits by directly selling securities to the woman and purchasing them from her, acting as a dealer and not as a broker in such transactions; that, although "confirmation slips" and letters pertaining to the transactions were sent to her, there was nothing, aside from the language of the slips and the letters, to put her on notice that she was dealing directly with the stockbroker as principal; and that she in fact was not so put on notice and did not understand the nature of such transactions, it could not properly have been ruled that the form of the slips was sufficient as a matter of law to put her on notice of the nature of the transactions.

BILL IN EQUITY, filed in the Superior Court on December 19, 1930, and afterwards amended, described in the opinion.

The suit was referred to a master. Material facts found by him are stated in the opinion. By order of *Williams*, J., there were entered an interlocutory decree confirming the master's report and supplemental report, as modified in

certain respects, and the final decree described in the opinion. The defendants appealed from both decrees.

*S. P. Sears*, (*R. H. Lee* with him,) for the defendants.

*F. H. Stewart*, (*L. Black* with him,) for the plaintiff.

CROSBY, J. The plaintiff in the bill of complaint alleges that in the months of November and December, 1926, she paid to the defendant corporation in cash the sum of $81,358.45 in trust, to invest and keep invested for her, and in her behalf and to her use, in high grade safe securities, and to account to her therefor; that on or about May 1, 1928, the defendant copartners took over the business of the defendant corporation, and, with full knowledge of said trust and of the fiduciary relations then existing between the corporation and the plaintiff, took possession of said trust funds, subject to said trust, and thereby became accountable to the plaintiff therefor; and that the defendants have failed and refused properly to account to the plaintiff for said trust funds. The prayers of the bill are that the trust be established; and that the defendant corporation and the defendant copartners jointly and severally be ordered to account to the plaintiff for said trust funds. A motion to amend the bill was filed and allowed containing further allegations of breaches of fiduciary duty on the part of the defendants, and an offer and tender by the plaintiff to the defendants of all interest, dividends and benefits which may have been paid to her or on her account by the defendants. The case was referred to a master who filed a report, and, on recommittal to him, he filed a supplemental report. An interlocutory decree was entered overruling objections to the reports and confirming them, subject to certain modifications. From this decree the defendants appealed. Thereafter a final decree was entered wherein it was ordered that the plaintiff is entitled to recover as of November 2, 1933, the sum of $51,134.16; that the defendant Arnold, Sears and Company, a limited partnership in which Walter Richmond Arnold and Winslow Sears are general partners, is indebted to the plaintiff in the sum of $51,134.16 and that execution issue therefor in favor of the plaintiff against said partnership; that the defendants Arnold

and Sears are jointly and severally indebted to the plaintiff in the sum of $51,134.16 and that execution issue therefor in favor of the plaintiff against them; that of the aforesaid sum the defendant Arnold and Sears, Incorporated, is indebted to the plaintiff in the sum of $29,176.18 and that execution issue therefor in favor of the plaintiff against that corporation; that the bill as amended be and the same is dismissed as to the individual defendants Walter L. Felch and Allen C. [G.?] Waite. From this decree and the rulings and orders upon which it was based the defendants appealed.

The master found the following facts: In August, 1926, the plaintiff was possessed of about $82,000 in cash which she had received as a settlement in divorce proceedings. It was deposited in three Boston banks. She desired to invest this money and was introduced to one Moody, a salesman in the employ of the defendants, who arranged for a conference between the plaintiff and the defendant Arnold. She was without any business experience and knew nothing about investments. Arnold, "who, in all he did, acted for the defendants," knew that the plaintiff had had no prior experience in handling or investing money. Moody had previously told Arnold that she knew practically nothing about "the security field." At her first meeting with Arnold she told him she had about $80,000 which she wanted to invest; that it was all she had to depend upon; that she never had any experience in buying or selling securities or investing money; that any one who might take care of her affairs would have to make all her decisions for her. Arnold said that "they would undertake to advise her as to what was best for her to invest in; that he would take charge of, and look after, her account and invest and reinvest her money properly in securities that a woman like her should have"; that if she decided to "go into their office" she would be well taken care of; he told her that "she could have trust and confidence in him and his partners." On November 10, 1926, Arnold wrote her a letter in which he described the bonds of three companies, and the units of preferred and common stocks of another com-

pany, and stated it was the understanding that she wanted "some high grade, safe securities . . . which you can buy feeling that they are perfectly safe . . . ." She decided to put her money into the securities so recommended and gave the defendants three checks totalling $81,358.45 which represented practically all the money she possessed. Thus began a course of dealings which lasted through the years 1927, 1928, and until July, 1929.

"Throughout the period between October, 1926, and July, 1929, the plaintiff was densely ignorant of matters relating to the making of investments." As to the methods of making investments she knew nothing except that one paid one's money over to a financial house and received some securities for it and that when selling one took "securities to a financial house and received from that house a check for their alleged value. She did not know how a financial house was to be compensated for any services it might render her," but supposed at some time she would receive a bill for such services. She had to be shown how to cut coupons from bonds, and an employee of her bank made out her deposit slips for her. She was in a constant state of confusion as to the exact amount of her income. In spite of letters and confirmation slips she did not know whether she was buying securities directly from the defendants, or, through them as brokers, from others, nor, when selling, whether she was selling directly to them, or through them to others. The defendant Arnold knew that "she had great confidence in his honesty, business ability, skill and experience in investments, and his general business capacity; that she trusted him; that he had influence with her in advising her as to investments; that she was ignorant of the commercial value of the securities he talked to her about; and that she had come to believe that he was very friendly with her and interested in helping her. He expected and invited her to have absolute confidence in him, and gave her to understand that she might safely apply to him for advice and counsel as to investments. . . . She unquestionably had it in her power to give orders to the defendants which the defendants would have had to

obey. In fact, however, every investment and every sale she made was made by her in reliance on the statements and advice of Arnold and she really exercised no independent judgment whatever. She relied wholly on him."

The master further found that the defendants were from time to time members of "syndicates" which put out securities for sale to the public, and at other times were members of a "selling group" which was allowed by syndicates to sell new securities to the public. As syndicate members the defendants paid a lesser sum for the securities than the price at which they were sold to the public, thereby realizing a profit. As members of selling groups the defendants paid to syndicates the same price for the securities as that at which they were sold to the public, and later on closing of the syndicates received from them a cash payment out of the syndicates' profits, thereby themselves realizing a profit. Between "November 10, 1926, and July 1, 1929, the defendants sold to the plaintiff securities costing her approximately $267,000. In each instance these securities were either owned by the defendants or were under their control as members of a selling group. The total amount of the profits realized by the defendants on these sales, over and above the cost of said securities to them, was $6,996.63. In no instance, and at no time, did Arnold or any one else representing the defendants, disclose to the plaintiff that the defendants were making any profit on said sales." The plaintiff did not understand that she was buying these securities from the defendants until about the middle of March, 1931, and did not learn of the gaining of profits by them on these transactions until the facts appeared at the master's hearing on May 11, 1931. On May 15, 1931, there was allowed an amendment to the bill setting forth the facts which the plaintiff had learned on May 11, 1931, relative to these transactions and that before she learned thereof she had sold all but two of the securities which the defendants had sold to her; tendering to the defendants the two securities which she still had "and all of the other . . . securities from time to time sold and delivered to the plaintiff by the defendant[s] and

not heretofore redelivered to the defendant[s], or . . . securities identical therewith, (according to Schedule C hereto annexed)," together with "all interest, dividends and benefits" received by her "upon or on account of" such securities; and demanding of the defendants the purchase price of the securities "with interest from the respective dates of payment."

The plaintiff was entitled to maintain an action for damages occasioned by the fraud practised upon her, or she could rescind the fraudulent transactions, and upon returning or offering to return the consideration received could recover the value paid therefor. *Perley* v. *Balch*, 23 Pick. 283. *Whiteside* v. *Brawley*, 152 Mass. 133. *Patch* v. *Cashman*, 244 Mass. 378. *Roche* v. *Gryzmish*, 277 Mass. 575, 579. The plaintiff having sold some of the securities sold to her by the defendants without knowledge or reason to know of the defendants' breach is entitled to rescind the contract notwithstanding such sale. The master found that the plaintiff on August 2, 1929, took her business affairs out of the defendants' hands; that she then owned the securities set up in schedule C of the amended bill; that she sold all of them except two between August 2, 1929, and the date of her filing of her bill in equity on December 19, 1930. The defendants do not deny the validity of the tender, because it is embodied in the amendment to the bill. It is the contention of the defendants that the burden was upon the plaintiff to prove the prices received from sales of the stock. No contention is made that any evidence was presented to the master upon this question. The defendants' ninth objection to the master's report is as follows: "Because there is no finding as to the interest, dividends and money received directly by the plaintiff by reason of her ownership of the securities which she purchased from the defendants between August, 1926, and August, 1929."

We are of opinion that the burden was not upon the plaintiff to show for what price she sold the stock which she had purchased from the defendants. If the defendants contended

that they were entitled upon an accounting to be credited for profits received by the plaintiff on such sales if there were any received therefrom the burden rested upon them to prove such profits. *Wilde* v. *Sawtelle,* 232 Mass. 117, 123. The plaintiff in her motion to amend the bill offered and tendered to the defendants "all interest, dividends and benefits which upon an accounting may be found to have been paid to or for the account of the plaintiff or credited to her upon the books of the defendants upon or on account of the securities set out in said schedule C." Thereafter by stipulation entered into by the parties, filed October 9, 1933, and before the entry of the interlocutory decree on November 14, 1933, the parties agreed that the sum of $11,341.52 represented "the total of all the interest dividends and benefits which were or should have been received by the plaintiff upon these securities from any source from the respective dates of their acquisition up to and including May 11, 1931." This stipulation was properly to be considered with the facts found by the master, and, unless upon all the facts so found and the facts so stipulated the final decree was plainly wrong, the decree must stand. *Frati* v. *Jannini,* 226 Mass. 430. *Lowell Co-operative Bank* v. *Sheridan,* 284 Mass. 594, 598. Under the stipulation we assume that the trial judge accepted as true all the allegations of the bill so far as they tend to support his conclusions.

If the defendants were not satisfied with the accounting of benefits made by the plaintiff, and contended that she had received additional sums from sales of the securities which had been purchased for her by the defendants, it was their duty to present evidence to that effect to the master. It is too late, after a full trial before a master and the entry of a final decree, for the defendants to contend that the plaintiff had received benefits from the sale of securities purchased by her from the defendants other than those for which she had accounted. As was said in *Ginn* v. *Almy,* 212 Mass. 486, at page 501: "It is too late after a fair and full trial before a master upon issues which if not stipulated in writing by the parties are expressly understood with-

out objection as embodying in substance the controversy within the pleadings, for the defeated party to contend upon exceptions, that the report should be set aside because it was possible to have raised pertinent questions, to which no reference is made." See also *Kennedy* v. *Welch,* 196 Mass. 592. As the plaintiff had no knowledge of the unlawful acts of the defendants when she sold the securities, she is entitled to rescission notwithstanding such sale.

Although the plaintiff did not discover the fraud of the defendants until after she had sold some of the securities, she is not thereby precluded from rescission as she offered to return securities identical with those she had purchased from the defendants and thereafter sold. See *Medbury* v. *Watson,* 6 Met. 246, 256, 257. If there was any delay on the part of the plaintiff in seeking rescission it was not due to any fault on her part but was due to the concealment and wrongful acts of the defendants.

The defendants rely upon their eighth objection to the master's report: "Because there is no finding as to what moneys the plaintiff received from the sale of securities set forth in schedule C of the amended bill of complaint." The answer to this objection is that the defendants, in assenting to a decree recommitting the case to the master, made no reference to the question raised by this objection. If the defendants relied upon the question it was their duty to ask the master on recommittal to find the facts respecting such sales. Moreover, the stipulation of the parties above referred to, entered into after the filing of the supplemental report by the master, in effect was a waiver of the eighth objection. There is nothing in the record to show that the plaintiff made any profit on any sales of securities by her. Having offered to return securities identical with those sold to her by the defendants, together with all other benefits received or which should have been received by her, the plaintiff was entitled to rescind the contract. *Ginn* v. *Almy,* 212 Mass. 486, 501. As there was no evidence to show what profit, if any, she received upon the sale of securities, and as the burden of proof of such profit rested

upon the defendants, we need not determine whether, if any profit had been shown, the defendants would be entitled to credit therefor in reduction of the plaintiff's claim.

It is found that in many instances the plaintiff resold to the defendants securities which she had previously bought of them. In each instance they sent her a "confirmation slip" of such sales. She did not appreciate that she was selling directly to them; she first learned that fact from her counsel in March, 1931. Most of the securities bought by the defendants from her were resold by them, occasionally at a higher price than they paid her. The master states that "Aside from the language in the confirmation slips and in the letters which accompanied some of them there was nothing to put the plaintiff on notice that she was dealing directly with the defendants as principals. That the plaintiff, under the circumstances, did not understand what was going on is not to be wondered at." On July 6, 1928, Arnold wrote her a letter purporting to set forth his activities with respect to her investments, in which it was stated that it was "for purposes of record and to give you an opportunity to further study your investments and some of the reasons for my making them." This letter contained many definite misrepresentations, which are referred to in the master's report. In the fall of 1928 the plaintiff talked with Arnold and purchased some speculative stocks on margin; these dealings were wholly "engineered" by Arnold. In none of these transactions does the plaintiff seek to recover for losses therein sustained.

On August 2, 1929, the plaintiff took her business affairs out of the defendants' hands. She then owned the securities which are set out in schedule C annexed to the amended bill of complaint. Their market value on that date was $67,941. These securities had cost her $77,438.09, and she owed the defendants $327.55 which was the net debit balance on her account with them. After taking her affairs out of the hands of the defendants and before the filing of the bill the plaintiff sold all but two of these securities set out in schedule C. On May 11, 1931, these securities had a market value of $43,846.12, and the total of all of the interest, dividends

and benefits upon these securities from the respective dates of their acquisition up to and including May 11, 1931, was $11,341.52, making the total value of these securities on that date $55,187.64. The secret profits received by the defendants upon sales to the plaintiff amounted to $6,996.63. Their secret profits on resales of securities repurchased from her were $875.50. The total of these two sums plus the purchase price of the securities set forth in schedule C with interest on all items to the date of the filing of the bill amounted to $99,160.73. The total value of the securities set forth in schedule C on May 11, 1931, together with the net debit balance upon the closing of the plaintiff's account with the defendants, amounted to $55,515.19. This left a balance in favor of the plaintiff, with interest computed to the date of the filing of the bill, of $43,645.54. With interest computed to the date of the filing of the master's supplemental report the total is $48,932.21 and in the final decree with interest computed to November 2, 1933, the total amounts to $51,134.16.

It appears from the master's supplemental report that in November, 1926, when the plaintiff began the transactions with the defendants, they were doing business as a corporation known as Arnold and Sears, Incorporated, of which Arnold was president and Sears was treasurer, and they together with the defendant Felch constituted the board of directors and were the sole stockholders. The corporation continued in business until May, 1928, when it was succeeded by a new limited partnership known as Arnold, Sears and Company, in which Arnold and Sears were general partners and Felch was a limited partner. As one of the steps in transferring the business and assets of the corporation to the limited partnership, the corporation on April 30, 1928, declared a special cash dividend of $67,498.36 which was equally divided among the three stockholders. The corporation then executed a bill of sale of all the remaining assets and business to the limited partnership in consideration of all outstanding stock of the corporation (which was then owned by the partners) and the assumption by the limited partnership and its members of "all contracts, agree-

ments, obligations and liabilities" of the corporation. The final decree recites that the plaintiff is entitled to recover as of November 2, 1933, the sum of $51,134.16. Of that amount the defendant corporation is found indebted to the plaintiff in the sum of $29,176.18, and the defendant limited partnership which took over the assets and liabilities of the defendant corporation is found to be indebted to the plaintiff in the full amount of $51,134.16, as are the general partners, the individual defendants Arnold and Sears.

It is the contention of the defendants that no trust or confidential relation existed between the parties, and that consequently no such relation has been violated by the defendants. The defendants further contend that if the plaintiff is entitled to rescission it must be limited to the two securities which she still holds, and that on the basis of an accounting she is limited to the secret profits received by the defendants, amounting to $6,996.63 plus interest, less the profits on any transactions for which other relief is granted.

The evidence not being reported, the master's findings must stand as it does not appear that they are inconsistent, or contradictory and plainly wrong. *Young* v. *Winkley*, 191 Mass. 570. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 334. The relations between the plaintiff and the defendants as found by the master were not those which ordinarily exist between a broker and his customer: the findings conclusively show that the relationship was one of trust and confidence, *Reed* v. *A. E. Little Co.* 256 Mass. 442, *Wendt* v. *Fischer*, 243 N. Y. 439, 443, 444, and that relying upon the good faith of the defendants the plaintiff placed in their hands for investment about $82,000, all the money she possessed. In these circumstances it was the duty of the defendants in investing the plaintiff's money to make full disclosure to her of their interest in the transactions instead of making secret profits for themselves in the purchase of securities with her funds.

In view of the findings and the further finding that the plaintiff "was densely ignorant of matters relating to the making of investments" and that she did not understand the nature of the transactions, and was not in fact put upon

notice thereof either by the letters or the "confirmation slips," it cannot be held that the form of the confirmation slips was sufficient as matter of law to put the plaintiff upon notice of the nature of the transactions. *McNulty* v. *Whitney*, 273 Mass. 494, 501, 502. In the ordinary case, where no special relation of trust and confidence exists, this court has held that where a broker holds shares of stock belonging to a customer with a general authority express or implied to sell them, he has no authority to sell them to himself, without the knowledge and assent of his customer, and if he does so the sale is voidable by the customer. *Hall* v. *Paine*, 224 Mass. 62, 74; *S. C.* 230 Mass. 62.

The master found that the plaintiff did not learn of the making of profits by the defendants on these transactions until May 11, 1931. It appears that four days later by amendment to the bill of complaint she offered to return all securities which the defendants had not previously repurchased from her, together with all interest, dividends and benefits which had accrued therefrom, and demanded of the defendants the purchase price of all said stocks and securities with interest. The tender so made entitled the plaintiff to rescind and repudiate the transactions and pursue the remedy which she seeks because of the defendants' breach of fiduciary duty. *Hall* v. *Paine*, 224 Mass. 62. *Wisbey* v. *Alan Shepard & Co. Inc.* 268 Mass. 21, 24. The rule of damages adopted by the master, and affirmed by the final decree, that the plaintiff upon rescinding the transactions and offering to return the securities and all benefits therefrom to the defendants was entitled to recover what she had paid with interest thereon, was correct. *McNulty* v. *Whitney*, 273 Mass. 494. *Roche* v. *Gryzmish*, 277 Mass. 575, 580. The plaintiff also was properly allowed to recover the amount of secret profits obtained by the defendants on sales by them to her, and on purchases from her, with interest thereon. *Wisbey* v. *Alan Shepard & Co. Inc.* 268 Mass. 21, 24.

The record fails to disclose any error of law. The right of the plaintiff to equitable relief is covered by the decision

in *Reed* v. *A. E. Little Co.* 256 Mass. 442, and cases therein cited.

The interlocutory decree is affirmed; final decree is affirmed with costs.

*Ordered accordingly.*