Quinlan, Regina L., J.
This action arises from a failed business partnership. In Counts I and II of the fourteen (14) count Complaint, the plaintiff, Arthur G. Chaprales, seeks to recover from the defendants David P. Peckham and Restaurant Accounting Services, Inc. the balance claimed due on a promissory note executed in conjunction with separation agreements. In answer to the plaintiffs complaint, the defendants filed an answer denying liability on the various counts including Counts I and II and asserting a number of affirmative defenses and a counterclaim asserting *595 claims against the plaintiff for breach of contract, breach of fiduciary duty and fraud. The plaintiff now seeks partial summary judgment on the promissory note claims in Counts I and II of the Complaint and also on the defendants’ Counterclaims. The motion is opposed by the defendants. For the following reasons, the motion is DENIED.
BACKGROUND
Based upon the record submitted with respect to the plaintiffs Motion for Partial Summary Judgment, the following is submitted as background for the purpose of this decision.
On or about September 1, 2006, the plaintiff and the defendant Peckham entered into a partnership agreement which resulted in the formation of the defendant Restaurant Accounting Services, Inc. (RAS II). The stock was held by the plaintiff and defendant Peckham with each holding 50%. The plaintiff had operated a similar business known as Restaurant Accounting Services (RAS I). The plan was for the plaintiff to continue in the business and be responsible for day to day operations of RAS II. The defendant Peckham would contribute financially to the development of RAS II. The plaintiff was responsible for providing the defendant Peckham with financial information concerning RAS II.
It was contemplated that RAS I would merge with RAS II. Certain representations had been made concerning RAS I, its revenues and operations which Peckham claims to have induced him to enter the partnership. As part of their agreement, the plaintiff would continue to service RAS I customers and RAS I was to pay RAS II a servicing fee equal to 30% of its weekly revenues.
RAS II was not a success. In 2007, RAS II lost $950,000. In 2008, RAS II lost another $370,000.00. The total loss for 2007 and 2008 was $1,270,000.00. During 2006 through 2008, Peckham made weekly contributions of capital and other payments as requested by the plaintiff. Peckham contributed $170,548.61 in 2006, $1,360,257.88 in 2007 and $466,689.00 in 2008. By contract, the plaintiff contributed no more than $88,508.00.
By mid-2008, the partnership deteriorated and negotiations began to dissolve the partnership. The plaintiff had agreed that Peckham would receive his 50% of the stock of RAS II. There is some dispute whether this was part of the separation agreement or whether it was a separate agreement made earlier in 2008. The parties were aware that time was of the essence to Peckham who intended to take the losses on his tax return due on October 15, 2008.
In the context of the dissolution, on or about October 2, 2008, the plaintiff and the defendant executed separation agreements dissolving their partnership. One of the documents executed individually and on behalf of RAS II by Peckham was a promissory note to the plaintiff in the amount of $200,000.00, payable in 8 installment of $25,000.00 per month. Payments totaling $50,000.00 were made, leaving a balance of $150,000.00.[1]
The note and other agreements were executed on October 2, 2008. According to Peckham, prior to execution of those documents, the plaintiff failed to produce financial information for RAS I and RAS II including their general ledgers, bank statements and other accounting records even when demanded during negotiations. He also is alleged to have failed to disclose his misuse and misappropriation of funds of RAS II. In the separation agreement, the plaintiff agreed to deliver all corporate records of RAS II to Peckham. On November 23, 2009, Peckham obtained a preliminary injunction requiring production of RAS II financial records by the plaintiff. Peckham also obtained additional financial information in discovery which had not been produced prior to October 2,2008. The records were examined in detail by Peckham’s accountant David Truesdell, CPA. The Truesdell affidavit detailing his examination of those records has been submitted in opposition to the plaintiffs motion for partial summary judgment.
According to the defendants, the plaintiff had failed to pay the full amount due for servicing RAS I clients as agreed. They claim that amount equaled some $861,000.00. The plaintiff does not dispute the amount but asserts the defendants knew this prior to October 2, 2008. The defendants assert that they discovered that despite representations from the plaintiff that certain payments had been made, they were not made. The plaintiff disputes this. The defendants allege that the plaintiff commingled accounts relating to RAS I, RAS II and his personal expenses. The plaintiff disputes this. The defendants further assert that the plaintiff sought and obtained monies in excess of development needs for RAS II by misrepresenting expenses. This is also disputed. However, the plaintiff asserts the dispute is immaterial because Peckham had concluded prior to October 2, 2008 that he had been misappropriating funds and used corporate funds for his personal expenses. The defendants assert that they were not fully aware until after they obtained corporate records which the plaintiff had withheld. The defendants assert that prior to October 2, 2008, the plaintiff falsely represented that he had not stolen from the defendants. According to Peckham’s affidavit, on July 18, 2008, in response to Peckham’s complaint about the plaintiffs accountant not honoring the agreement to transfer of all stock to Peckham, the plaintiff stated in an email “the truth of the matter is in fact I have never ‘stolen from you’ . . .” (Peckham Affidavit ¶16-18.] The plaintiff does not dispute the statement but asserts that Peckham had concluded (suspected?) that the plaintiff had in fact stolen from him prior to October 2, 2008.
*596 On October 2, 2008 in conjunction with the separation agreement, the plaintiff and the defendants also executed a “RELEASE AGREEMENT' which provided inter alia:
RAS II and Peckham, each individually and for himself or itself and for his or its employees, officers, directors, agents, servants, executors, administrators, estates, heirs, successors, assigns, legal representatives and other representatives, in good faith do hereby release, acquit and forever discharge RAS I and Chaprales and his or its employees, officers, directors, agents, servants, executors, administrators, estates, heirs, successors, assigns, legal representatives and other representatives, from any and all actions, causes of action, rights, claims, demands, damages, liabilities, suits, controversies, proceedings, and any other claims, whether known or unknown, of any kind or nature (including without limitation all liabilities for costs, losses, expenses and attorneys fees), which RAS II or Peckham now has or ever had from the beginning of the world to this date, whether known or unknown, now existing or hereafter arising, including, but not limited to, any claim which arises directly or indirectly out of or relates directly or indirectly to the Partnership, but excluding any claim or cause of action arising out of RAS I or Chaprales’s failure to perform any of his or its obligations under the Separation Agreement, Confidential Information and Nonsolicitation Agreement or the Stock Purchase Agreement.
DISCUSSION
The plaintiff seeks partial summary judgment on Counts I and II of the complaint and on the defendants’ counterclaims. Essentially, the plaintiff argues that he is entitled to judgment as a matter of law because the Release Agreement absolved him of any liability for deficiencies in the performance of his duties as a partner and operating officer of RAS II as well as for any misappropriations of funds from the defendants. The plaintiff also claims that the Release Agreement forecloses the defendants from asserting any defenses they may have to the promissory note.
The scope of the Release Agreement in this case is, on its face, “breathtaking.” See Leblanc v. Friedman, 438 Mass. 592, 598 and 601 (2003). A release is a form of contract, and the interpretation of that contract is a question of law for the court. Id. at 596-97. Massachusetts courts will enforce a general release disposing of all claims and demands arising out of any transactions between the parties, even if they did not have in mind all the wrongs which existed at the time of the release. Id. 597-98. However, the status or relationship of the parties is material to the interpretation and effectiveness of the release. See Aiken v. Warner, 318 Mass. 669, 675 (1945).
As partners and shareholders in a closely held corporation, the plaintiff and the defendant Peckham owed each other a fiduciary duty, i.e. a duty of the “utmost good faith and loyalty.” O’Brien v. Pearson, 449 Mass. 377, 383 (2007), citing Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593 (1975), quoting Cardullo v. Landau, 329 Mass. 5, 8 (1952). A release will not be effective to discharge a fiduciary’s liability for breach of the trust imposed in him unless the person executing the release had knowledge of all relevant facts that the fiduciary knew or should have known. Diamond v. Pappathanasi, 2009 WL 1539792 (25 Mass. L. Rptr. 500] (Mass.Super., Hinkle, J.) (2009), citing Allen v. Moushegian, 320 Mass. 746, 757 (1947); Akin v. Warner, 318 Mass. at 675 (“release not valid where fiduciary induced plaintiff to sign it by misrepresentation concerning investment account”); Flynn v. Colbert, 251 Mass. 489, 493 (1925) (“release did not bar action against guardian concerning settlement of estate where guardian misrepresented that he had accounted for all assets”); Shane v. Shane, 891 F.2d 976, 986 (1st Cir. 1989) (“release accompanying minority shareholder’s sale of stock in close corporation voided by other shareholders’ misrepresentation that company was worth nothing and failure to disclose pledge of new capital infusion”).[2] What the defendants knew and when they knew it are material to the effectiveness (or lack thereof) of the Release Agreement. What the plaintiff told the defendants and the completeness and/or truthfulness of that information is material to the issue of liability both of the defendants with respect to Counts I and II and to the liability of the plaintiff to the claims asserted in the counterclaims. These disputed material facts preclude summary judgment on both the plaintiffs claims and the defendants’ counterclaims.
ORDER
Based upon the foregoing, the Plaintiffs Motion for Partial Summary Judgment is DENIED.

The balance due of $150,000.00 has been paid into court pending resolution of this action.

See also cases relating to the tort for breach of fiduciary duty: Lattuca v. Robsham, 442 Mass. 205, 213 (2004) (“We consistently have held that a cause of action for breach of fiduciary duty does not arise until the beneficiary is aware that repudiation has occurred”); Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 520-21 (1997) (actual knowledge standard applies to plaintiff who argues that breach of fiduciary duty of disclosure constitutes fraudulent concealment). Mere suspicion or mere knowledge that the fiduciary has acted improperly does not amount to actual knowledge that the plaintiff has suffered harm. See, e.g., Lattuca v. Robsham, supra at 214; Demoulas v. Demoulas Super Mkts., Inc., supra at 522 (actual knowledge does not derive from plaintiffs receipt of certain documents where plaintiff and his family had not read documents because of express trust they placed in defendant fiduciaries, and where documents not adequately explained nor copies furnished); Akin v. Warner, supra at 675 (fiduciary’s demand that beneficiaiy sign purported release in favor of the fiduciary was not sufficient evidence of beneficiary’s actual knowledge that fiduciary has harmed her).